UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL HILLS,

                  Petitioner,

v.

GREG MCQUIGGIN,

                  Respondent.

_____/

Case No. 4:08-cv-14354

HONORABLE MARK A. GOLDSMITH

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING IN PART AND GRANTING IN PART ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner Michael Hills is a prisoner in the custody of the Michigan Department of Corrections. Petitioner was convicted by a St. Clair County jury of first-degree murder, kidnapping, and conspiracy, and sentenced to life in prison for the murder conviction and concurrent terms of 23 to 50 years in prison for the kidnapping and conspiracy convictions. This matter comes before the Court on Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.

### I. FACTS AND PROCEDURAL HISTORY

The body of the victim, 20-year-old Ryan Rich, was discovered in the trunk of a burning car early in the morning of Monday, June 27, 2005, about 12 miles outside the Port Huron, Michigan. Rich's hands and feet were bound behind his body with electrical cord. The fire was caused by gasoline poured in the trunk and back seat of the vehicle and lit by an open flame. The cause of death was a large fracture on the back of the head, caused by a round hard object that struck the area with sufficient force to punch a hole in the skull. The medical examiner opined that this blow was struck prior to the fire and caused the death, most likely within one or two minutes of the blow.

Some time before June 26th, Damon Johnson overheard co-defendants Michael Bowman and Steward Ginnetti discussing Ryan Rich.  Ginnetti told Bowman that he thought Rich was working for the Drug Task Force.  Bowman also told his girlfriend, Sara Apsey, sometime before the 26th, that he was upset with Rich because he was "throwing out names."  Apsey believed this was in relation to Bowman and his friends dealing cocaine.

In the evening of June 26, 2005, Bowman, Apsey and Johnson were at the Office Bar from about 10:00 to 10:30 p.m. until about 2:00 a.m.  Bowman used his cell phone frequently while at the bar.  Following one call, he told Johnson "he's there."  Ginnetti came into the bar around 11:00 that evening, had a short conversation with Bowman, and then left.  After another call, shortly before they left the bar, Bowman told Johnson, "I'm going to kill that mother fucker."  When Bowman, Apsey, and Johnson left the bar, Bowman asked to be dropped at a car wash on Lapeer Road and 32nd Street, in the vicinity of Robbins Court.  Bowman spoke on his cell phone as he got out of the vehicle.  Apsey heard him ask, "Is he in the trunk?"  Bowman asked Apsey to hold his cell phone, coat, watch, and wallet.  A couple of hours later, Bowman called the cell phone he left with Apsey asking if Johnson could pick him up.  Johnson drove with a friend and picked Bowman up at the car wash at Lapeer and 32nd Street.  From the time he was dropped off to the time he returned to Apsey's, Bowman was gone about two or two and a half hours.  It was between 4:30 and 5.00 a.m. when he returned.  When he arrived at Apsey's apartment, he was limping and his hand was swollen.

Nicole Fountain, Rich's girlfriend, testified that she and Rich were at Ginnetti's and Nick Dobson's home on the evening of Sunday, June 26, 2005, along with Ginnetti, Dobson, and Karin Stebbins, Ginnetti's girlfriend.  Dobson and Ginnetti were friends with Rich.  Dobson and Ginnetti left the house at some point in the evening.  Some time later, Rich received a telephone call on his cell phone.  After taking the call, Rich told Fountain that he was going to a party with Ginnetti and Dobson for about a half an hour.  Karin Stebbins also received a call and told Fountain that Ginnetti

2

was at the Hills' house and that she (Stebbins) needed to take a phone charger to him.  Stebbins took the phone charger to Ginnetti and then returned to Ginnetti and Dobson's house.  Rich left by himself shortly afterwards.

Petitioner, 17 years old at the time, lived at Robbins Court in Port Huron with his mother, Laurie McConnell, his older brother, co-defendant Robert Hills, and his two younger sisters, 14 year old Heather, and 12 year old Brandy.  When Rich arrived at the Hills' house, McConnell was there, along with Petitioner, Robert Hills, Heather, and Brandy.  Ginnetti and Dobson had been there earlier, left, and then returned to the Robbins Court house at about the same time as Rich.  Petitioner's mother went to the store to purchase beer for her sons and their friends, and then went to her room for the rest of the night.

Heather Hills, Petitioner's sister, testified that she went out to the garage to see what her brother Michael was doing and saw Petitioner, Dobson, and Rich sitting there.  She saw Ginnetti outside talking to a male that she had never seen before, but who she subsequently came to know as James Cunningham.  When Heather came into the garage, Petitioner came up to her in a hurried manner and told her to go back in the house for a few minutes, and also asked her to bring him a CD and a CD player.  When Heather returned to the garage with the CD and CD player, the Petitioner met her at the door.  Heather gave Petitioner the items.  Petitioner told her to go back inside for a few minutes and Heather returned to the house.  Heather testified that Robert Hills, her older brother, was inside the house pacing and talking on his cell phone for most of the night.  At some point, Heather testified that Robert told her that "the kid that's in the garage snitched on Stewey and they were waiting for Bo to get there because they were going to tie him up and put him in the back of Bo's car and take him out to the country."  Heather testified that she understood the "kid" to refer to Rich, and she understood "they" to refer to Ginnetti and a person named Bo.  A few minutes later,

Petitioner came back into the house, went to the laundry room, grabbed what looked like tape, and went back outside. That was the last time she saw him that night.

Ginnetti, Robert Hills and Dobson were seen at a gas station shortly before 5:00a.m. purchasing gasoline and pop. They pumped the gasoline into a gas can. Ginnetti returned to the gas station alone about half an hour later and bought gum.

After Rich's body was found the next morning, detectives interviewed several people, including Petitioner. At that time, Petitioner told the detectives that he, his brother Robert, and Steward Ginnetti were sitting around, drinking beer the previous evening. He told detectives that Rich came to the house a little after midnight, but left about an hour later, around 1:00 a.m., after receiving a telephone call. Rich told them he was going to another party for about half an hour and would be back. That was the last time Petitioner saw Rich. The detective testified that Ginnetti told him virtually the same story.

On June 28, 2005, the police and deputies executed a search warrant for Petitioner's house and garage. The officers observed oil covered with kitty litter on the floor of the garage. The mixture covered the floor from the side door to the middle of the side of the garage that was not occupied by a car. The officers found a pair of bloody socks in a tool box. The blood stains were analyzed and found to match the DNA profile of Ryan Rich. The deputies also found a pool cue case, later identified as Ryan Rich's, a CD player, and a roll of clear tape. Tests detected the presence of blood in the garage, on the side tire of the car parked in the garage, a shoe print on the floor, and two other areas on the floor.

Petitioner was taken into custody and questioned again. The videotape of this interrogation was admitted at Petitioner's trial, over defense objections that the statement was involuntary. Petitioner was given his *Miranda* warnings and agreed to talk with detectives. Petitioner initially stated that he was partying that night with his brother Robert, Ginnetti, Dobson and another person,

a "kid" who Petitioner had seen twice before, who was friends with Ginnetti and Dobson. Tr. 631. Ginnetti and Dobson came over around 9:00 or 10:00 p.m., while the kid came later, around 12:15 to 12:45 a.m. Tr. 641. The kid sat in the garage with Ginnetti and Dobson, while Robert was in the house. Petitioner told the police that he went into the house at one point to get tape to tape over a peephole on the door that looked from the home to the detached garage, but said that he did that because he did not want his mother to see how much they were drinking. Tr. 646-47. Petitioner told the detectives he did not know anything else.

After being told by the officers that Ginnetti and "everybody" talked, Petitioner admitted to hearing someone at the party say that "this kid" who came over to party with them had snitched on Ginnetti. Tr. 653. Petitioner did not know what for and did not ask because it was none of his business. Petitioner said that their plan was just to scare him. Petitioner said that "everybody tackled him down,"[1] and that Petitioner was to go and get the tape to tie him up. Tr. 654. Petitioner said that when he got back with the tape the others had already tied the victim with an extension cord. Tr. 654-55. Petitioner said the people tying the victim were Ginnetti, Dobson, and some other person that he had never seen before. Tr. 656. The victim was tied, sitting on the floor of the garage leaning against the car tire. Tr. 657. Petitioner heard someone tell the victim "you ratted me out." Tr. 658. Ginnetti said something about the kid taking away his money and then struck the victim. Tr. 658, 689. The victim kept saying "no, [I] didn't. No, [I] didn't." Tr. 658. About this time someone else pulled in the driveway and Petitioner was told to leave the garage and not look at whoever it was. Tr. 658-59. Petitioner said that he took off his glasses because he was afraid of the guy that arrived. Tr. 662. After this, Petitioner sat outside with Dobson, drinking beer. He did not know what was going on in the garage. The music was blaring but he could hear sounds, like things

---

[1]Petitioner also appeared to admit to the officers that he himself had participated in the tackling. In response to an officer's question, "You helped jump on him and help[ed] wrestle him down," Hills responded, "Yeah. That's why I brought the tape, after those guys held him down . . ." Tr. 695.

being thrown around.  Tr. 659.  At some point Dobson came out and told him to look out the road,

away from the garage.  He heard doors opening and closing and "they all got up and they left."  Tr.

660.

Petitioner said that after they left, he found that they had "poured oil on the floor" of the

garage.  He bought kitty litter the next morning to clean up oil that had been poured on the floor.

Tr. 666-67.  He said that he did not see any blood in the garage, just oil.

During the course of the interview, one detective questioned Petitioner as follows:

Do you want me to tell you what you did?  I'll tell you what you did.  Stewey told you
he was having a hard time getting him finished.  You said: All you got to do is snap his
neck man.  Stewey couldn't do it.  You were in the garage, you tried it, but you couldn't
get it done?

Tr. 674.  Petitioner denied this.  He also insisted that he did not know about any plan until after the

victim arrived at the house.  Tr. 675.  The detective also said that "Stewey and Robert both tell me

you helped carry him out and you guys also took a little ride with the guy."  Tr. 678.  Petitioner

denied this.

A second interview was conducted on June 29, 2005.  This videotaped interview was admitted

by the consent of defense counsel, who waived a possible *Miranda* violation that occurred at the

beginning of the interview, when the Petitioner stated that "I already said everything I need to say"

and "I ain't saying nothing."  Tr. 698-99.   During this second interview, Petitioner admitted to both

helping tie Rich up "for a second," and standing guard at the door to the garage while the others tied

Rich up. Tr. 711.  He said he was ordered back to the door by the big blond guy. Tr. 711-712.

At one point early in the interview, one of the detectives stated that "I have more than one

person telling me that you literally went in there and grabbed his head and you tried to twist it to

snap his neck," to which the Petitioner responded "Fuck, no," and reiterated that he never went in

the garage.  Tr. 703.  Petitioner also denied that he called the victim.  Petitioner agreed that he went

6

into the house, took the tape, brought it to the garage and tossed it to the "Blond hair guy, lots of tattoos." Tr. 705. The blond guy "killed" the lights and Petitioner was ordered back to the door. Petitioner heard Ginnetti asking the kid "Did you snitch on me? Did you -- you know, you know, are you taking money out of my pocket . . . ." Tr. 709. Petitioner said that there was one smack to the "kid's" head and "someone pulled up in another vehicle and I was told to get out of the garage. And not to look at the person that was in the vehicle." Dobson and Ginnetti told Petitioner not to look at the person in the vehicle: "Don't look at this guy. He said: Do not look at him or he will shoot you." Tr. 710. Petitioner said that he left the garage, took his glasses off, facing the corner of his house so he had a straight line to follow and stood there. Tr. 713. Petitioner stated that the guy that pulled up was "huge." Petitioner did not see anything from that point onward because he did not look back. After everyone left, Petitioner went out to the garage to see if there was any more beer, and at that point saw "the oil and shit on the floor." Tr. 728. He found some Southern Comfort and started drinking and surfing the internet. His mother was up, and he told her that he had spilled the oil in the garage so that no one else would get in trouble for spilling the oil. He went to the store around 8:00 or 9:00 a.m. to purchase kitty litter to soak up the oil. Tr. 730-31.

Following a six-day jury trial, Petitioner was convicted of first-degree premeditated murder or, in the alternative, first-degree felony murder; kidnapping, and conspiracy to commit kidnapping. He was sentenced to life without the possibility of parole for the first degree murder conviction, and concurrent terms of 23 to 50 years on the kidnapping and conspiracy counts.

Petitioner raised what now form his seven habeas claims in his appeal of right in the Michigan Court of Appeals. Petitioner asserted an additional claim regarding double jeopardy that he does not assert in his habeas petition because he obtained relief from the court of appeals on this issue. The court of appeals vacated Petitioner's kidnapping conviction, because Petitioner's convictions for both first-degree murder and kidnapping violated double jeopardy protections, but affirmed his

remaining convictions and sentences. *People v. Hills*, No. 269504, 2007 WL 4355435 (Mich. Ct. App. Dec. 13, 2007). Petitioner then raised the claims in the Michigan Supreme Court. The Supreme Court denied leave to appeal because the Court was not persuaded that the questions presented should be reviewed. *People v. Hills*, 747 N.W.2d 287 (Mich. Apr. 28, 2008).

## II. STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this court's habeas corpus review of state-court decisions and states in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). A federal habeas court may not find a state adjudication to be unreasonable

8

"simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

## III.  ANALYSIS

Petitioner raises the following seven claims for habeas relief:

I.   The prosecutor failed to introduce sufficient evidence to support the conviction offenses. Petitioner was denied his constitutional right to due process and a fair trial and is entitled to a reversal of the convictions.  Alternatively, the verdict is against the great weight of the evidence.  The trial court erred where it denied Petitioner's motions for a new trial. The conviction should be vacated and the matter remanded for a new trial.

II.  Petitioner requested a unanimity instruction regarding the two theories of first degree murder.  The trial court refused the request.  The court instructed the jury on both premeditated murder and felony murder without instructing the jury that it must agree on a theory in order to convict.  Petitioner was denied his constitutional right to a properly instructed jury.  He is entitled to a new trial.

III. The jury was presented with hearsay statements of at least two co-defendants indicating that Petitioner tried to snap the victim's neck and otherwise participated in the murder. Petitioner never had the opportunity to cross-examine these co-defendants. Petitioner was denied his right under the United States and Michigan Constitutions to confront the witnesses against him.  Petitioner is entitled to a new trial.

IV.  Police officers extracted an involuntary confession from Petitioner.  The trial court abused its discretion by denying Petitioner's motion to suppress the statement.  Petitioner is entitled to a new trial.

V.   The prosecutor committed repeated acts of misconduct and thereby denied Petitioner his Due Process rights to a fair trial.  The conviction should be reversed.

VI.  Trial counsel provided ineffective assistance.  Petitioner is entitled to a new trial.  In the alternative, Petitioner is entitled to an evidentiary hearing.

VII.    The cumulative effects of individual errors made in this case prejudiced Petitioner to such an extent that Petitioner was denied a fair trial.  The conviction should be reversed.

In his response to the Petition, Respondent argues that Petitioner's third and fifth habeas claims are procedurally defaulted because they were not preserved in the trial court, and that the remaining habeas claims lack merit because the state court reasonably applied clearly established federal law.

A.  Sufficiency of the Evidence

9

Petitioner's first claim for habeas relief asserts that his convictions for conspiracy to kidnap, kidnapping, and first degree murder violate his right to due process of law because the evidence introduced at trial was insufficient to sustain these convictions.

The standard for assessing a constitutional sufficiency of the evidence claim was established by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). There, the Supreme Court held that a prisoner is entitled to habeas relief if the court finds that "upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324. This standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. The reviewing court must review the evidence in the light most favorable to the prosecution. *Id.* at 319. "[T]his means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (quoting *Jackson,* 443 U.S. at 326). The Court must also consider all evidence admitted by the trial court, regardless of whether the evidence was admitted correctly. *Id.* at 672. On habeas review, where the state court determined that sufficient evidence exists to support the conviction, the conviction may be set aside on grounds of insufficiency of the evidence only if the state court's conclusion that the evidence was sufficient was itself "objectively unreasonable." *Id.* at 673.

1. Sufficiency of Evidence for Charge of Conspiracy to Kidnap

The Petitioner asserts that the evidence adduced at trial was insufficient to sustain his conviction for conspiracy to kidnap. The Michigan Court of Appeals considered and rejected this claim on the merits, and thus this Court's review is limited to determining if that holding was unreasonable application of the law or an unreasonable construction of the facts. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

The Michigan Court of Appeals set out the elements of the crime of conspiracy to kidnap:

"A conspiracy is a partnership in criminal purposes." *People v. Blume*, 443 Mich. 476, 481 (1993) (internal quotations and citations omitted). To create a conspiracy, "two or more individuals must have voluntarily agreed to effectuate the commission of a criminal offense." *People v. Justice* (After Remand), 454 Mich. 334, 345 (1997). The gist of the offense of conspiracy lies in the unlawful agreement. *Blume*, supra at 481. Therefore, it is critical to show that the accused had the specific intent to "combine to pursue the criminal objective of their agreement." *Justice*, supra at 345.

"[D]irect proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties." *Id.* at 347. Reasonable inferences may be drawn from the evidence to establish the coconspirators' intentions. *Id.* at 347-348.

*Hills*, 2007 WL 4355435 at *1.

The court concluded that there was sufficient evidence admitted at trial to support Petitioner's conviction for conspiracy to kidnap:

In the present case, defendant told the police that he knew that the victim had allegedly snitched on codefendant Ginnetti, and that he knew of the plan to tie up the victim, "smack him up and take him somewhere else." Defendant also admitted that he helped tackle the victim, obtained the tape that was used to bind the victim, helped tie the victim up, obtained a CD player to mask the noise, placed tape over a peephole in the garage to prevent anyone outside from looking in, and kept people away from the garage during the offense. Other witnesses corroborated defendant's participation in these activities. Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that defendant voluntarily agreed to effectuate the secret-confinement kidnapping of the victim. There was sufficient evidence to support defendant's conspiracy conviction, and the conviction is not against the great weight of the evidence.

*Id.* at *2.

Petitioner argues that the court of appeals opinion asserts unreasonably that Petitioner basically admitted every element of the crime of conspiracy. Petitioner argues that there is no evidence that the Petitioner knew of any plot or plan until after the victim arrived and that he consistently denied to the police that he had any prior knowledge of a plan to harm the victim. Petitioner argues that the evidence does not show any prior knowledge of a plan or participation in a conspiracy, but instead shows that he was given selected facts and orders after other people who were involved in the conspiracy began to carry out their plans.

The Petitioner's argument fails to meet his extremely high burden of showing that the Michigan court unreasonably determined the facts established at trial.   AEDPA provides that any state court determination of a factual issue is presumed to be correct, and that presumption may only be rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  While the Petitioner insisted in his videotaped interrogation that he thought the victim was just invited to party with him and his co-defendants, Petitioner later admitted that he was told that the victim had "snitched on Stewey for something."   He admitted knowing the others had a plan to scare the victim.  Petitioner admitted that he participated in the plan by helping tackle the victim, getting the tape, getting the CD player and CDs from his sister, and standing watch outside the garage.  Petitioner admitted to taping a peephole on a door in the house that overlooked the garage.  He admitted he was outside the garage while the other defendants "blared the music" and he could hear "things, you know, getting trashed around in here."  He admitted telling his mother he had spilled the oil in the garage and purchasing kitty litter to clean up oil that the others had poured onto the floor of the garage, although he denied any knowledge that there was blood under the oil.  In light of this evidence, the Court cannot find that the Michigan court's determination of the facts was clearly erroneous.  A reasonable jury could use these facts as circumstantial evidence to conclude that Petitioner entered into an agreement with the other defendants to kidnap the victim, and could disbelieve Petitioner's denial of prior knowledge.  The absence of direct evidence of the Petitioner's knowledge of the conspiracy before the victim was attacked and the Petitioner's denial of such prior knowledge are not sufficient to establish by clear and convincing evidence that the facts determined by the court of appeals were erroneous.

Petitioner has also failed to meet his burden of showing that the Michigan court unreasonably applied the *Jackson* standard in holding that sufficient evidence supported his conviction for conspiracy to kidnap.  Upon habeas review of a state court holding that the evidence was sufficient to sustain a conviction, the court must "accord a double layer of deference."  *White v. Steele*, 602

F.3d 707, 710 (6th Cir. 2009). The court must first determine "whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Konteh*, 567 F.3d at 205 (emphasis original). Even if the court concludes that a rational trier of fact could not have found the essential elements beyond a reasonable doubt, the court must still defer to the contrary decision of the state court so long as that decision was not unreasonable. *Id.* "Courts must draw a difficult line between inference and speculation, and when a state court draws a reasonable one, we defer to its judgment." *White*, 602 F.3d at 711.

The holding of the Michigan court that there was sufficient evidence of conspiracy to kidnap is not contrary to or an unreasonable application of the *Jackson* standard. While there was no direct evidence that Petitioner agreed to kidnap the victim and formed the specific intent to kidnap the victim, the evidence recited by the Michigan Court of Appeals, viewed in the light most favorable to the prosecution, was sufficient for the jury to infer that Petitioner had conspired with the other participants to kidnap the victim with the specific intent of effectuating the kidnapping.

### 2. Sufficiency of Evidence for Kidnapping

The Michigan Court of Appeals vacated Petitioner's conviction for kidnapping on double jeopardy grounds. *See Hills,* 2007 WL 4355435 at *5. Petitioner's challenge to the sufficiency of the evidence to support his conviction for kidnapping is therefore moot as an independent claim. However, because the kidnapping was an element of felony murder, the Court will address the sufficiency of the evidence for kidnapping.

The Michigan court first recited the elements of secret-confinement kidnapping

Defendant was convicted of the secret-confinement form of kidnapping. MCL 750.349 provides that a person is guilty of "secret confinement" kidnapping if he

wilfully, maliciously, and without lawful authority shall . . . secretly confine or imprison any other person within this state against his will.

> This form of kidnapping does not require proof of specific intent, or proof of asportation. *People v. Jaffray*, 445 Mich. 287, 297-299 (1994).

*Hills*, 2007 WL 4355435, at *2. On direct appeal, Petitioner argued that the evidence was insufficient to sustain a conviction for secret confinement kidnapping because several people knew of the victim's location, including Heather Hills, Karin Stebbins and Nicole Fountain. The Michigan Court of Appeals rejected this argument, holding that total concealment was not required, so long as the victim's location is concealed from those that could help, and the perpetrators intended to keep the confinement secret. The court also held that Petitioner's actions in taping the peephole, keeping people away from the garage, and playing music to mask the noise from inside, showed sufficient intent to keep the confinement secret, and to prevent the victim from obtaining assistance. *Hills*, 2007 WL 4355435 at *2-3

Petitioner argues that the Michigan court's conclusion unreasonably determined the facts because there is no evidence that he kept people away from the garage or played loud music to mask the noise. Petitioner fails to meet his burden of showing by clear and convincing evidence that the Michigan court's factual determination was incorrect. Petitioner admitted to obtaining a CD player, which he gave to his co-defendants in the garage, and which he said was used to mask noise from the garage, he admitted that he watched outside while the victim was being assaulted in the garage, and he told his sister to stay inside. The conclusion of the Michigan Court of Appeals is not based upon an unreasonable determination of the record facts.

### 3. Sufficiency of Evidence for First-Degree Murder

Under Michigan law, first-degree murder includes murder committed with premeditation and deliberation, as well as felony murder. The jury was instructed on both premeditated murder and felony murder. Petitioner asserts that there was insufficient evidence to convict him of first degree murder on either theory. Upon review of the record, the Court finds that the Michigan courts reasonably held that there was sufficient evidence to convict on either theory.

14

The Michigan Court of Appeals stated the elements of first-degree premeditated murder:

> In order to convict a defendant of first-degree premeditated murder, the prosecution must prove that the defendant acted with premeditation and deliberation. *People v. Anderson*, 209 Mich.App 527, 537 (1995). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or a problem." *People v. Furman*, 158 Mich. App 302, 308 (1987). Defendant was also charged under an aiding and abetting theory. To convict defendant of premeditated murder under an aiding and abetting theory, "the prosecutor was required to show that at the time of the [killing] the defendant either had the premeditated and deliberate intent to kill the victim or that [he] participated knowing that the principal possessed this specific intent." *People v. Youngblood*, 165 Mich.App 381, 387 (1988).

*Hills*, 2007 WL 4355435 at *3.

The court held that the evidence adduced at trial was sufficient to convict the Petitioner of first degree premeditated murder under an aiding and abetting theory:

> The evidence indicated that defendant rendered assistance knowing that the codefendants believed that the victim had been cooperating with the police. Although defendant claimed that he warned the others that he did not want anyone killed, the evidence supports an inference that he participated in the offense with knowledge that his codefendants had a premeditated intent to kill the victim. Thus, viewed in a light most favorable to the prosecution, there was sufficient evidence to enable the jury to find defendant guilty of first-degree premeditated murder.

*Id.* These findings by the state court are presumed correct on habeas review. *Brown*, 567 F.3d at 195-96. While there is no direct evidence that the Petitioner participated in the kidnapping with the knowledge that the others had a premeditated intent to kill the victim, "[a] conviction may be sustained based on nothing more than circumstantial evidence." *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008). Nor need the evidence exclude every reasonable hypothesis except guilt. *Id.* Circumstantial evidence that may be considered under Michigan law in determining intent include "'a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.'" *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999) (quoting *People v. Turner*, 540 N.W.2d 728 (Mich. Ct. App. 1995)). The facts recited by the state court are sufficient for a reasonable jury to infer that the Petitioner assisted in the kidnapping knowing that the others intended to kill the victim.

15

Petitioner also challenges the sufficiency of the evidence for the charge of felony murder. The

Michigan Court of Appeals stated the elements of first degree felony murder under Michigan law:

> "The elements of first-degree felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., with malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b) ]." *People v. Smith*, 478 Mich. 292, 318-319 (2007) (citations and internal quotations omitted).
>
> To be convicted of aiding and abetting felony murder, "[t]he requisite intent is that necessary to be convicted of the crime as a principal," that is, malice. *People v. Kelly*, 423 Mich. 261, 278 (1985). "[I]t therefore must be shown that the aider and abettor had the intent to kill, the intent to cause great bodily harm or wantonly and wilfully disregarded the likelihood of the natural tendency of his behavior to cause death or great bodily harm." *Id.*; see also *People v. Barrera*, 451 Mich. 261, 294 (1996). "[I]f the aider and abettor participates in a crime with knowledge of his principal's intent to kill or to cause great bodily harm, he is acting with 'wanton and willful disregard' sufficient to support a finding of malice...." *Kelly, supra* at 278-279 (citation omitted).

*Hills*, 2007 WL 4355435 at *3-4.

The Michigan Court of Appeals held that the evidence was constitutionally sufficient to

convict the Petitioner of first-degree felony murder:

> The evidence that defendant participated in the offense with knowledge that his codefendants had a premeditated intent to kill the victim was sufficient to establish the requisite malice for first-degree felony murder. Malice was also show[n] by the evidence that defendant admittedly knew that Bowman and Ginnetti were going to beat the victim up for snitching, and by defendant's conduct in helping to tackle the victim, obtaining tape that was used to bind the victim, helping to tie the victim up, and then covering the peephole, keeping others away from the garage, and masking the noise from the garage. Viewed in a light most favorable to the prosecution, this evidence shows that defendant participated in the offense in wanton and wilful disregard of the likelihood that the natural tendency of his behavior would be to cause death or great bodily harm.
>
> Kidnapping is an enumerated felony in MCL 750.316(1)(b) and, as previously discussed, there was sufficient evidence that defendant participated in the kidnapping. Also, the evidence established that the victim was killed during the commission of the kidnapping offense.
>
> For these reasons, the evidence was sufficient to support a conviction of first-degree felony murder.

*Hills*, 2007 WL 4355435, *4.

16

This holding is not contrary to or an unreasonable application of the *Jackson* standard.  As discussed above, there was sufficient evidence for a rational jury to infer that Petitioner aided in the kidnapping knowing that his co-defendants intended to kill the victim.  There is also sufficient evidence from which a rational jury could infer that Petitioner acted with the intent to cause great bodily harm or wilfully disregarded the likelihood of the natural tendency of his behavior to cause death or great bodily harm.  Petitioner is not entitled to habeas relief on the grounds of insufficient evidence.

### B. Failure to give unanimity instruction

Petitioner asserts that he was denied his right to due process when the jury was instructed that a conviction for first degree murder could be based upon a finding of either felony murder or premeditated murder but the trial court denied Petitioner's request for an instruction that the juries' verdict must be unanimous as to one of the two theories.  The Michigan Court of Appeals considered and rejected this argument on the merits, finding that Petitioner was not entitled to a unanimity instruction under either Michigan law or under the United States Constitution.  *Hills,* 2007 WL 4355435 at *5.

Petitioner argued in his state appeal that a unanimity instruction was required under Michigan law.  Any claim that the state erred in applying its own law is not cognizable on habeas review.  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).  Furthermore, the Michigan Court of Appeals held that the failure to give a unanimity instruction in this case was consistent with Michigan law.  This holding is binding on this Court.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

Petitioner argues that the Michigan Court rejection of his request for a unanimity instruction was an unreasonable application of *Schad v. Arizona*, 501 U.S. 624 (1991).  *Schad* in no way assists Petitioner.  In *Schad*, a plurality of the United States Supreme Court held that a conviction under an

17

instruction that did not require the jury to unanimously agree upon one of the alternative theories of premeditated murder and felony murder did not constitute a denial of due process. *Schad*, 501 U.S. at 631 (plurality opinion). The *Schad* plurality held that where a general verdict as to first degree murder was permissible under state law, the failure to require the jury to agree as to a single theory did not violate due process. *Id.* at 637. Here, the Michigan court held that such a general verdict is permissible as a matter of Michigan law. *Hills*, 2007 WL 4355435 at *4. Furthermore, as discussed above, the evidence was sufficient for the jury to convict Petitioner under either theory. The Michigan court reasonably applied *Schad* in declining to require a specific unanimity instruction.

## C.  Confrontation Clause

During Petitioner's videotaped interrogation, which was admitted at trial, the detectives told Petitioner that they had interviewed Ginnetti, Dobson and Petitioner's brother Robert, and that other witnesses had told them that the Petitioner had actively participated in the beating and murder of the victim.[2]  Petitioner argues in his third claim for habeas relief that his Sixth Amendment right of

---

[2] The relevant videotaped instances, played at trial, are as follows:

- A detective stated to Petitioner that "Stewey told you he was having a hard time getting him finished. You said: All you got to do is snap his neck man. Stewey couldn't do it. You were in the garage, you tried it, but you couldn't get it done?" Tr. 674.  Petitioner responded, "Oh, no, I didn't." *Id.*

- The same detective stated to Petitioner, "You're telling me that Stewey's lying when he says that -- he said you -- that they couldn't finish him and you said all you got to do is . . . (inaudible). Tr. 675. Petitioner responded, "Yeah, I didn't have the fucking heart to try to kill somebody. I couldn't fucking do it if my life depended on it. I had no involvement in that bullshit. I did not know -- if they killed him in there, I didn't know about it. I thought they were just going to smack him up and take him somewhere else." *Id.*

- The other detective told Petitioner, " . . . Stewey and Robert both tell me you helped carry him out and you guys also took a little ride with the guy." Tr. 678. Petitioner responded, "I was at home. Ask my mom. I was staying inside. I stayed at the house after those guys left . . . ." *Id.*

- The same detective told Petitioner, "I have more than one person telling me that you literally

confrontation was violated by the introduction at his trial of these out-of-court statements allegedly made by several non-testifying co-defendants. Respondent argues that Petitioner's Confrontation Clause claim is procedurally defaulted because Petitioner's trial counsel did not object to the admission of the statements at trial and the Michigan Court of Appeals relied on the failure of counsel to object in limiting its review of Petitioner's claim to plain error.

The procedural default doctrine applies to bar federal habeas relief when a state court has declined to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Review is barred because the state judgment does not rest on federal constitutional principles but rests upon independent and adequate state procedural grounds. *Id.* A habeas petitioner procedurally defaults a claim if:

> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc).

All three elements of procedural default are met here. Petitioner failed to object to the introduction of the statements at trial and therefore failed to preserve his Confrontation Clause claim as a matter of Michigan procedural law. The Michigan rule requiring contemporaneous objections is an adequate and independent state law bar to review. *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011). The rule was actually enforced in Petitioner's case, in that the Court of Appeals limited its review of the claim to plain error, which in this circuit is considered to be enforcement of the procedural default. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

As Petitioner's claims are procedurally defaulted, review in this Court is barred unless the petitioner's default can be excused. *Coleman*, 501 U.S. at 750. To overcome a procedural default,

---

went in there and grabbed his head and you tried to twist it to snap his neck." Tr. 703. Petitioner responded "Fuck, no. . . . I never went in the garage. They told me to get out, just face the other way." *Id.*

a habeas petitioner must show cause for his default and prejudice as a result of the alleged constitutional error, or demonstrate that the Court's failure to consider the substantive merits of his claims will result in a fundamental miscarriage carriage of justice.  *Id.*  In order to demonstrate "cause" for a procedural default, a petitioner must show that "some objective factor external to the defense" impeded his efforts to raise the claim in the state courts. *McCleskey v. Zant*, 499 U.S. 467, 493  (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Objective factors can include interference by state officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. *Id.* at 493–94. Once the petitioner has established cause, he must also show that "actual prejudice" resulted from the claimed constitutional errors.  *Id.* at 494.  Alternatively, the petitioner's default can be excused if he can establish that his case is the "extraordinary instance[]" in which the constitutional violation "probably has caused the conviction of one innocent of the crime." *Id.*  Petitioner does not argue that this "actual innocence" exception applies.

Petitioner asserts ineffective assistance of counsel as cause for his failure to preserve his habeas claims.   In order to constitute cause for a procedural default, the Petitioner must establish more than a mistake by his trial counsel. "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Carrier*, 477 U.S. at 488-89).

To establish ineffective assistance of counsel, the Petitioner must show that his trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish deficient performance, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  To establish prejudice, the Petitioner must show "that

counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.*[3]  Prejudice requires showing that "there is a reasonable probability that the proceedings would have been different" without the attorney's unprofessional error. *Id.* at 694.  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

Respondent argues that Petitioner cannot show that the failure of his counsel to object on Confrontation Clause grounds to the admission of the statements was ineffective assistance, because such objection would have been futile.  In support, Respondent cites the Michigan Court of Appeals' analysis of this issue on direct review.  There, the court concluded, on plain error review, that because the out-of-court statements contained in the interrogators' questions were not offered or admitted for their truth, but rather were offered for "observing defendant's reaction, and to place his answers in context," there was no violation of Petitioner's Confrontation Clause rights.  *Hills*, 2007 WL 4355435 at *6.

The Court observes that this rationale is likely constitutionally problematic.  Under the Sixth Amendment, a criminal defendant has the right "to be confronted with the witnesses against him." *Coy v. Iowa*, 487 U.S. 1012, 1015, (1988).  The Confrontation Clause generally bars witnesses from reporting the out-of-court statements of nontestifying declarants.  *See Crawford v. Washington*, 541 U.S. 36, 54-56, (2004).  Specifically, the Supreme Court in the landmark 2004 *Crawford* case held that testimonial, out-of-court statements offered against the accused to establish the truth of the matter asserted may only be admitted where the declarant is unavailable and where the defendant has had a prior opportunity to cross-examine the declarant.  Id. at 59, 68.  Thus:

> Police officers cannot, through their trial testimony, refer to the substance of statements given to them by nontestifying witnesses in the course of their investigation, when those statements inculpate the defendant.  When the statement from an out-of-court witness is offered for its truth, constitutional error can arise.

---

[3]In determining whether Petitioner's trial counsel was ineffective for purposes of establishing cause, no AEDPA deference is owed to the state court's legal conclusion that the *Strickland* standard was not met.  *Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006).

> This principle is well established.  *See* 2 Charles T. McCormick, McCormick on Evidence § 249, at 104 (4th ed. 1992); *see also United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) ("Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination . . . would eviscerate the constitutional right to confront and cross-examine one's accusers.")

*Taylor v. Cain*, 545 F.3d 327, 335 (5th Cir. 2008).

This prohibition appears to apply squarely to the facts of this case.  There can be no question that the statements at issue are "testimonial."  "While the [*Crawford*] Court declined to 'spell out a comprehensive definition of "testimonial,"' it stated that the term 'applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.'"  *United States v. Cromer*, 389 F.3d 662, 671-72 (6th Cir. 2004).  The detectives represented in Petitioner's interrogation that the statements were the accusations of co-defendants obtained in the police interrogation of those defendants.

Further, while the court of appeals asserted that the co-defendant accusations embedded in the detectives' questions were not presented for their truth, but rather to gauge Petitioner's reaction, this Court has reason to reject this assertion.  First, it is unclear to this Court what the purported purpose of the testimony actually was.  The court of appeals opinion does not cite the record in support; it merely asserts the purpose of the testimony as fact.  The prosecution -- the entity offering the testimony -- did not make this argument, because there was no objection lodged against the testimony at trial.  Second, even assuming that the prosecution would have taken the position that the testimony was not offered for the truth of the matter, under the circumstances of this case, such a position should be rejected.  Courts need not merely accept the assertion that certain otherwise-excludable testimonial hearsay is not for the truth of the matter asserted.  *See United States v. Cromer*, 389 F.3d 662, 677 (6th Cir. 2004) (holding that an out-of-court statement, allegedly admissible as background or context evidence, violated the Confrontation Clause because it "implicated [the defendant] in a way that went to the very heart of the prosecutor's case").  *United*

22

*States v. Silva*, 380 F.3d 1018, 1019-20 (7th Cir. 2004) (rejecting trial court's assertion that testimonial evidence inculpating the defendant was not offered for the truth of the matter: "Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the [S]ixth [A]mendment and the hearsay rule."); *United States v. Powers*, 500 F.3d 500, 504, 509 (6th Cir. 2007) (concluding that testimony that the defendant was a well-known cocaine supplier and testimony identifying a vehicle as the defendant's violated the Confrontation Clause, despite trial court's ruling that the statements were not offered for the truth of the matter asserted); *see also* Michael H. Graham, 30B Federal Practice & Procedure § 7005 (2d ed. 2011).[4] Accordingly, the admission of the testimonial statements in question likely violated Petitioner's Confrontation Clause rights.

Nevertheless, even assuming that counsel's failure to object to a potential Confrontation Clause violation amounts to deficient performance by Petitioner's trial counsel,[5] under the circumstances

---

[4] In a similar vein, Federal Practice and Procedure has observed:

> Another group falling outside the category of hearsay consists of statements made by one person which become known to another offered as a circumstance under which the latter acted and as bearing upon his conduct. For example, for a law enforcement official to explain his going to the scene of the crime by stating that he received a radio call to proceed to a given location or to explain why an investigation was undertaken or other subsequent action, such testimony is not hearsay. However if he becomes more specific by repeating definite complaints of a particular crime by the accused, this is so likely to be misused by the jury as evidence of the fact asserted that the content of the statement should, absent special circumstances enhancing probative value, be excluded on the grounds that the probative value of the statement admitted for a non-hearsay purpose is substantially outweighed by the danger of unfair prejudice, Rule 403.

*Id.*

[5] There may be an argument that, because Petitioner's vehement denials were also heard by the jury, along with the prohibited testimonial evidence, trial counsel could have been acting pursuant to some sort of legitimate trial strategy. Although, under *Strickland*, courts acknowledge a "presumption that, under the circumstances, the challenged action might be considered sound trial

of this case, the Court concludes that the prejudice prong of the two-part *Strickland* test is not met. For Petitioner to meet the standard, he would have to demonstrate that there is a reasonable probability that the proceedings would have been different. However, that is not the case here. Although the forbidden testimony was the only source for the allegations that Petitioner may have tried to "snap the neck" of the victim, or that he may have helped carry the victim from the garage, the majority of the evidence against Petitioner was separate from the Confrontation-Clause-related testimony. Setting aside the problematic testimony, a juror would still have likely concluded that Petitioner (i) knew the other participants in the assault wanted to beat up victim, scare him, and take him somewhere, because the victim had snitched on them, (ii) taped the peephole to the garage, (iii) obtained the cd player and cd, (iv) tackled the victim along with others, (v) taped up the victim, (vi) stood guard at the garage, and (vii) took steps to clean up the garage the next morning. In addition, the Court notes that the prosecution did not emphasize the problematic testimony; it was not mentioned in closing argument. Accordingly, the Court cannot conclude that there is a reasonable probability that the proceedings would have been different had counsel properly objected to the testimony violating the Confrontation Clause.

As Petitioner's trial counsel was not constitutionally ineffective under *Strickland* in failing to preserve a Confrontation Clause challenge, this failure therefore does not constitute cause to excuse the default of this claim. Thus, Petitioner has defaulted his third habeas claim, and has failed to establish cause and prejudice for this failure or a fundamental miscarriage of justice. Therefore, federal review of Petitioner's third habeas claim is not available and the Court will not reach the merits of this claim.

---

strategy," 466 U.S. at 689 (internal quotation marks omitted), neither party has made any trial-strategy arguments on this specific issue. The Court need not resolve this point, however, as Petitioner fails to demonstrate prejudice.

D.   Voluntariness of Confession

Petitioner's fourth habeas claim asserts that his statements to the police should have been suppressed at trial because they were not voluntary.  The Michigan Court of Appeals considered and rejected this claim on the merits.  *Hills*, 2007 WL 4355435 at *6-7.  Habeas relief is therefore available on this claim only if the decision of the court of appeals unreasonably applied clearly established federal law.

The Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  The Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436 (1966), required procedural safeguards as a prerequisite to the admission of statements that are the product of custodial interrogation.  In order for statement that is the product of custodial interrogation to be admitted at trial, the police must have administered the *Miranda* warnings.  *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010).  If the *Miranda* warnings have been administered, the court can then consider whether there has been a waiver of the *Miranda* rights.  *Id.*  A suspect may waive his privilege against self-incrimination, provided that the waiver is made voluntarily, knowingly, and intelligently.  *Miranda*, 384 U.S. at 444.  A statement is not compelled within the meaning of the Fifth Amendment if the speaker waives his constitutional privilege voluntarily, knowingly and intelligently.  *Colorado v. Spring*, 479 U.S. 564, 573 (1987).   The state has the burden to establish waiver by a preponderance of the evidence.  *Berghius*, 130 S. Ct. at 2261.

The inquiry whether a waiver is coerced has two dimensions.

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

25

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 422 U.S. 707, 725 (1979) (other citations omitted)).

The trial court held a *Walker* hearing prior to trial.[6]  At the hearing, the Petitioner testified that a police officer "stomped" on his head when he was arrested at his house shortly before his first videotaped interrogation.  Petitioner testified that his face went into the floor, his eyeglasses cut underneath his eye and she scraped his nose and was bleeding.  *Walker* hr'g at 41-42 (Dkt. 8-8).  In the videotape, one police officer asks the Petitioner if his eye is "doing all right" and Petitioner responds "[i]t hurts like hell."  *Id*. at 8.  The interrogators avoided answering Petitioner when he asked if he was under arrest.  Petitioner testified that he thought he would be released from custody if he spoke to the interrogating officers.  *Id*. at 51.

The Michigan Court of Appeals rejected Petitioner's claim that his waiver was involuntary:

> The trial court conducted an evidentiary hearing on the issue of voluntariness. Although the evidence showed that defendant was injured during his arrest, he did not request medical treatment during the interview, despite an offer thereof by the police. Treatment was provided later, after defendant asked for it. Defendant does not claim that he was coerced into speaking by sheer pain, or that treatment was made contingent on his speaking to the police. The evidence also showed that defendant was under arrest, knew that he was under arrest, and was advised of his rights. Defendant had been arrested before, and had been advised of his rights before, and conceded that he understood his rights and voluntarily waived them. Defendant asserts that the officers told him, in essence, that if he did not tell them the truth, they were going to lock him up and then interview someone else.  However, defendant concedes that the police never said anything that would reasonably lead him to believe that he would be released if he agreed to talk.  Rather, defendant was, unrealistically, "hoping" to be released if he cooperated. The police did nothing to engender that belief.

> The totality of the circumstance shows that the police did not coerce or intimidate defendant into making a statement.  Therefore, the trial court did not err in finding that defendant's statement was voluntary, and denying his motion to suppress.

*Hills,*  2007 WL 4355435, *6 -7.

---

[6]A *Walker* hearing is a hearing held in Michigan state courts, outside the presence of the jury, to determine whether a confession was voluntarily made. *See People v. Walker*, 132 N.W.2d 87 (Mich. 1965).

The state court did not unreasonably apply federal precedent in finding that the Petitioner validly waived his Fifth Amendment right against self-incrimination. The Michigan Court of Appeals correctly recited the requirements for a valid waiver. *See id.* at *6. Therefore, habeas relief is available only if that court unreasonably applied the standard, or unreasonably determined the facts. *Daoud v. Davis*, 618 F.3d 525, 529-30 (6th Cir. 2010).

A review of the record shows that the Michigan court did not unreasonably apply federal law in holding Petitioner validly waived his *Miranda* rights. While Petitioner was only 17 when he was interrogated, there is no clearly established Supreme Court precedent holding that a 17 year old cannot validly waive his *Miranda* rights.[7] He acknowledged that he understood his *Miranda* rights at the outset of the interview. Although Petitioner complains at the beginning of the interrogation that his eye "hurts like hell," he does not reference it later, and there is no evidence that this injury rendered his statement involuntary. The police detectives did not answer Petitioner when he asked if he was under arrest, urged him to talk to them allegedly in his own interest, and told him that other defendants were talking, but there is no clearly established United States Supreme Court precedent that holds any of this to be improper. *Cf. Bobby v. Dixon*, 132 S. Ct. 26, 30 (2011) (habeas may not issue for violation of Fifth Amendment when no Supreme Court holding establishes that police may not urge suspect to confess before another suspect does). While Petitioner asserted that another police officer injured him when he was arrested, he does not assert that he was injured during the interrogation or was injured by either of the interrogating officers.

Petitioner has failed to establish that the Michigan court unreasonably applied clearly established Supreme Court precedent in holding that the state had met its burden to show a valid waiver of *Miranda* rights. Habeas relief is therefore not available for Petitioner's fourth claim.

E. Prosecutorial Misconduct

---

[7] *JDB v. North Carolina*, 131 S. Ct. 2394 (2011), which held that a child's age is relevant to the question of voluntariness, post-dates the petition, and would not require a different result.

27

Petitioner argues in his fifth claim for habeas relief that his right to due process and a fair trial was violated by prosecutorial misconduct. Respondent argues that Petitioner's prosecutorial misconduct claim is procedurally defaulted.

Petitioner's prosecutorial misconduct claim is procedurally defaulted by his failure to make a contemporaneous objection at trial to the prosecutor's conduct. As discussed above, Michigan has a contemporaneous-objection rule, under which a defendant's failure to contemporaneously object to trial errors "leads to the claim[] being waived and reviewed solely for plain error." *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011). Petitioner did not object to the misconduct at trial, and therefore failed to comply with the rule. The procedural rule was enforced in this case, with the court of appeals reviewing Petitioner's claim for plain error. *Hills*, 2007 WL 4355435, *7, *9. Michigan's contemporaneous-objection rule is an adequate and independent state-law ground barring review of federal claims in state court. *Taylor*, 649 F.3d at 451. All the elements of procedural default are satisfied, and Petitioner's prosecutorial misconduct claim, therefore, is procedurally defaulted. Habeas review is available only if Petitioner can establish cause for failing to comply with the procedural rule, and resulting prejudice, or, alternatively, if Petitioner can establish a fundamental miscarriage of justice.

Petitioner argues that his trial counsel's failure to object at trial to the conduct of the prosecutor constituted ineffective assistance of counsel, and this was cause for his default. To show that he was denied the effective assistance of counsel under federal constitutional standards, a habeas petitioner must satisfy the two pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In evaluating a claim of prosecutorial misconduct, "[t]he relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The courts in this circuit use a two-step test to determine

28

whether prosecutorial misconduct amounted to a denial of due process. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). The court must first determine whether the prosecutor's statements were improper. *Id.* If the court finds one or more statements improper, the court must then "'look to see if they were flagrant and warrant reversal.'" *Id.* (quoting *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)). Flagrancy is determined by considering whether: 1) the statements tended to mislead the jury or prejudice the defendant; 2) were they isolated or part of a pattern; 3) were they deliberate or accidental; and 4) the strength of the evidence. *Id.*

With these standards in mind, the Court looks at Petitioner's claims of prosecutorial misconduct, and whether his trial counsel was ineffective for failing to object to each instance.

### 1. Drug Organization

Petitioner argues that his counsel was ineffective for failing to object to the prosecutor's reference to facts not in evidence when she stated that Petitioner had admitted to being part of Ginnetti's drug organization. During closing arguments, the prosecutor stated as follows:

> Now, the defense has made a lot -- if Ryan was snitching, they claims; Well, that's Bowman's problem. That's Ginnetti's problem. Defendant acknowledged in that tape that he smokes dope on occasion, he is part of this drug organization, and if someone's giving up information to law enforcement, that's a threat to the entire organization.

Petitioner's trial counsel did not err in failing to object to this statement. The statement that Petitioner admitted using drugs was true. The statement "he is part of this drug organization," could reasonably be construed as a request by the prosecutor to the jury to draw an inference, reasonably supported by the evidence, that Petitioner was part of the organization. Petitioner admitted that he knew Ginnetti was dealing drugs, that he knew the victim had been "snitching," and that he knew of and assisted in the others' plan to seize the victim. Petitioner's counsel was not ineffective for failing to object.

## 2. Bloody Socks

Petitioner argues that the prosecutor referred to facts not in evidence when she stated that the bloody socks found in the tool box belonged to defendant, and that his trial counsel was ineffective for failing to object to the reference.

In her rebuttal, the prosecutor addressed Petitioner's argument that he did not know that he was cleaning up a murder scene because he failed to remove a bloodied sock that was found in a toolbox in the garage.

> Why didn't he clean up the socks, they ask you. Ryan's blood [is] on those socks. You can take them back and look at them. It's not just a drop. They're coved in blood. You can see that in the photograph. Ask yourself, members of the jury, whose socks are those? You know that Ginnetti, Dobson, and Robert Hills left with Ryan to dispose of his body. And if you look at the autopsy report you'll see that Ryan was wearing his socks. They're not Ryan's socks. Whose socks are they in the garage, in that tool box at the Hills residence after they take that body. The only reasonable inference is that they're his socks. He wasn't very smart. He didn't hide them very far. He just hid them in that tool box covered in Ryan's blood.

Considering the comments in context, it was reasonable for the prosecutor to ask the jury to infer that the socks belonged to Petitioner. Therefore, the prosecutor's argument was not improper, and Petitioner's counsel was not ineffective for failing to object.

## 3. Co-defendants' Statements

Petitioner argues that the prosecutor may have knowingly allowed false evidence to reach the jury by using the co-defendants' statements at trial, which were contained within the officer's questions during his videotaped interrogations. However, Petitioner offers no evidence that the statements were untrue, and at a post-judgment hearing, both the prosecutor and the judge confirmed that such statements had in fact been made by the co-defendants. Petitioner has thus not met his burden to show that the prosecutor introduced false evidence, and that his counsel was ineffective for failing to object to such evidence.

## 4. The Victim's Photograph

Petitioner argues that the prosecutor committed misconduct by displaying the victim's photograph during closing argument, and therefore making an impermissible appeal to the jurors for sympathy, and his trial counsel was ineffective for failing to object to the prosecutor's action.

The prosecutor displayed the picture of the victim's body during her closing argument. She pointed out to the jury the cord that was wrapped around the victims's arms, legs, feet and his neck, and reminded the jury that Petitioner had admitted to helping tackle the victim, obtaining tape to bind the victim, and helping bind the victim. It is not clear how long the picture remained in the jury's view, but it was replaced at some point by a picture of the victim alive. The prosecutor stated of the victim:

> He was a son, he was a grandson, he was a brother, he was a cousin, and he was loved by a lot of people and he did not deserve to die this way. I tell you that not because I'm trying to get your sympathy. the Judge is going to tell you don't base your verdict on sympathy. I tell you because what Ryan deserves and what his family deserves and what this community deserves is justice.

Considered in context, the prosecutor's use of the photographs was not improper. The prosecutor used the photographs to argue that Petitioner should be convicted based on the evidence. "Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). The prosecutor's comments here were permissible, as they were based on the evidence, rather than an attempt to have the jury ignore the evidence in the case. Petitioner's trial counsel was not ineffective for failing to object.

Petitioner has failed to establish that his trial counsel was ineffective for failing to object to the various instances of claimed prosecutorial misconduct, and has therefore failed to establish cause to excuse his procedural default. Because Petitioner's procedural default is unexcused, the Court will not reach the merits of his claims of prosecutorial misconduct.

F.  Ineffective Assistance of Trial Counsel

31

Petitioner's sixth claim for habeas relief asserts that his trial counsel was constitutionally ineffective because (i) he failed to move to have Petitioner's co-defendants' statements redacted from Petitioner's videotaped interrogation, (ii) despite a possible *Miranda* violation, he agreed to admit Petitioner's second custodial statement, (iii) he failed to move to have redacted references to Petitioner's prior arrests, and (iv) he failed to object to various instances of prosecutorial misconduct.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a habeas petitioner must satisfy the two- pronged test of *Strickland v. Washington*. First, the petitioner must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the petitioner must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* Petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Id.* at 689. Petitioner must also show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court's holding in *Strickland* places the burden on the petitioner who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *Wong v. Belmontes*, 130 S. Ct. 383, 390-91 (2009).

On habeas review, a second level of deference applies. On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable -- a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473

(2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### 1. Failure to Redact Co-defendants' Statements

Petitioner argues that his trial counsel was ineffective because counsel did not move to redact from the first videotaped interrogation, the statements of Petitioner's co-defendants that were contained within questions asked by the police officers. At one point during the interrogation, Lieutenant Bloomfield told Petitioner "Stewey told you he was having a hard time getting him finished. You said: All you got to do is snap his neck, man. Stewey couldn't do it. You were in the garage, you tried it but you couldn't get it done?" to which Petitioner replied, "Oh no I didn't." Bloomfield also said, "You're telling me that Stewey's lying when he says that -- he said you -- that they couldn't finish him and you said all you got to do is . . . ." Later, Detective Patterson tells Petitioner that "Stewey and Robert both tell me you helped carry him out and you guys also took a little ride with the guy," to which Petitioner responded that Ginnetti, Robert, and Nick all left, while he stayed behind at the house.

The Court has thoroughly addressed this issue in the previous part of this Opinion concerning the Confrontation Clause. The analysis there suffices to reject this claim.[8]

### 2. Admission of Petitioner's Second Custodial Statement

---

[8] The Court notes that Petitioner does not specify what objection counsel should have raised. To the extent Petitioner might assert that the proper course was some objection *other* than a Confrontation Clause objection, the Court's prior prejudice analysis would still serve to reject Petitioner's claim.

Petitioner argues that his trial counsel erred by requesting that his second videotaped statement be admitted into evidence, despite the prosecution's decision not to admit it because of a possible *Miranda* violation.  The Michigan Court of Appeals considered and rejected this claim on the merits:

> "Decisions concerning what evidence to present and whether to call or question a witness are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v. Davis*, 250 Mich.App 357, 368 (2002).  Regarding the substance of the crime, defendant admitted very little in the second interview that he had not already admitted in the first. Additionally, the second statement contained matters that defense counsel reasonably could use to defendant's advantage during closing argument. For example, in the second statement, the detectives repeatedly pressured defendant until he finally agreed to talk. Defendant also showed some empathy for the victim, and told the police that he felt that he should be "in the same condition that kid is . . . I should be where he's at."
>
> Defendant has not overcome the presumption that defense counsel's decision to introduce defendant's second statement, after the trial court refused to suppress the first statement, was a matter of sound trial strategy. The fact that a particular strategy does not work, does not prove that counsel was ineffective.  *People v. Matuszak*, 263 Mich. App 42, 61 (2004).

*Hills*, 2007 WL 4355435 at **10-11.  The Michigan court did not unreasonably apply *Strickland* in rejecting Petitioner's ineffective assistance of counsel claim based upon trial counsel's offer to admit into evidence Petitioner's second custodial statement.  The second statement added little additional evidence against Petitioner, aside from his admission that he briefly assisted in tying the victim.[9]  It also contained a more cohesive statement of Petitioner's version of the events, emphasized his secondary role, and also had statements of contrition.  The decision to admit the second videotaped interrogation was within the realm of reasonable trial strategy.

### 3.  Failure to Redact Evidence of Defendant's Prior Arrests

---

[9] The Court notes that although Petitioner's admission that he briefly assisted in tying the victim occurred in the second statement in question, Petitioner had already affirmed in the prior interview played for the jury that he had "helped jump on [the victim] and help[ed] wrestle him down." Tr. 695.

Petitioner argues that his trial counsel erred by failing to move to redact from the videotaped interrogation comments that he made about prior arrests. The Michigan Court of Appeals rejected this claim of ineffective assistance of counsel on the merits.

> A failure to object can be a serious error that results in prejudice. *People v. Kimble*, 470 Mich. 305, 314 (2004). But the decision whether to object to an alleged impropriety can also be a matter of trial strategy. *Matuszak, supra* at 58. Defendant's comment concerning prior arrests was made in the context of defendant's questions to the officers regarding whether he was under arrest. During closing argument, defense counsel argued that defendant's police statement was coerced, because, despite repeated questions, the interrogating officers never clearly told him whether he was under arrest. Defense counsel reasonably may have decided to forego challenging the comment about prior arrests, so that he could argue that the officers' failure to directly answer defendant's question whether he was presently under arrest demonstrated that the statement was coerced. Defendant has failed to overcome the presumption of sound trial strategy.

*Id*. at *11. A claim of ineffective assistance of counsel "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Petitioner offers no evidence to overcome this presumption, and the transcript supports the Michigan court's inferences. The Michigan court's holding was not an unreasonable application of *Strickland*.

### 4. Failure to Object to Prosecutorial Misconduct

Petitioner's final argument is that his trial counsel was ineffective for failing to object to various cases of prosecutorial misconduct. The Michigan Court of Appeals rejected this claim of ineffective assistance of counsel on the grounds that the prosecutor did not commit misconduct and therefore trial counsel had no obligation to object

> Defendant argues that defense counsel was ineffective for failing to object to the prosecutor's comments concerning defendant's membership in a drug organization and the bloody socks. We disagree. As previously discussed in section VI, supra, the prosecutor's comments were not improper. Therefore, defense counsel was not ineffective for failing to make a meritless objection. *People v. Kulpinski*, 243 Mich.App 8, 27 (2000).

*Hills*, 2007 WL 4355435 at *11.

35

This holding is supported by the law and the record, as discussed above.  The Michigan courts' rejection of Petitioner's claim of ineffective assistance of counsel is not an unreasonable application of *Strickland.*

### G.  Cumulative Errors

Petitioner argues that the cumulated errors of his trial counsel justify habeas relief.  In this Circuit, claims of cumulated trial errors are not cognizable under § 2254.  *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

## IV. CERTIFICATE OF APPEALABILITY

A petitioner must receive a certificate of appealability ("COA") in order to appeal the denial of a habeas petition for relief from either a state or federal conviction.  28 U.S.C. §§ 2253(c)(1)(A), (B).  A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a federal district court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  The Court finds that Petitioner has not met this standard with regard to his first, second, fourth, fifth, sixth, and seventh habeas claims, and declines to issue a certification of appealability with regard to these claims.  However, the Court grants Petitioner a certificate of appealability with regard to his third (Confrontation Clause) claim.

36

## V.  CONCLUSION

For the reasons stated above, IT IS ORDERED that the Petition for Writ of Habeas Corpus is DENIED.

IT IS FURTHER ORDERED that the Court DECLINES to issue a certificate of appealability as to all claims except Petitioner's third (Confrontation Clause) claim.  The Court GRANTS a certificate of appealability on this claim alone.

Dated: March 30, 2012                  s/Mark A. Goldsmith
    Flint, Michigan                    MARK A. GOLDSMITH
                                         United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 30, 2012.

                          s/Deborah J. Goltz
                          DEBORAH J. GOLTZ
                          Case Manager